IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSI ANTONIO RODRIGUEZ,<br><br>                    Petitioner,<br><br>          vs.<br><br>RAYMOND MADDEN, Acting Warden,<br>California State Prison, Centinela,[1]<br><br>                    Respondent. | No. 2:13-cv-02595-JKS<br><br>MEMORANDUM DECISION |

Jessi Antonio Rodriguez, a state prisoner proceeding *pro se*, filed a Petition for Writ of

Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Rodriguez is currently in the

custody of the California Department of Corrections and Rehabilitation and is incarcerated at

Centinela State Prison.  Respondent has answered, and Rodriguez has replied.

I. BACKGROUND/PRIOR PROCEEDINGS

In resolving his claims on direct appeal, the Court of Appeal recounted the facts of this

case as follows:

A. *People's Case*

1. *Witnesses Observe Shooting*
    On October 16, 2008, Baldemar Solis was proceeding to the onramp of Highway
80 from the Waterman Boulevard intersection in Fairfield.  An older white Mustang
convertible seating at least three people was near the intersection.  A Black male of
medium height approached the convertible.  When the light turned green, he jumped into
the backseat and then fell back on the ground, losing one shoe.  The man got up with a
gun and fired three or more times.  Solis called 911 from the nearby Safeway.  He did not
get a good look at the shooter's face and could not identify him.

---

[1]          Raymond Madden, Acting Warden, California State Prison, Centinela, is
substituted for J.D. Janda, former Warden, Calipatria State Prison.  Fed. R. Civ. P. 25(c).

Donald Watts was in the Safeway parking lot at the time.  He witnessed a light-colored Mustang convertible with the top down and a dark SUV that cut off the Mustang.  A light-skinned male with a ponytail exited the passenger side of the SUV and ran to the passenger side of the Mustang.  There was an argument; one man ran one way, another the other way; seven or eight shots were fired.  A young male passenger was hit in the side of his head; he went into a restaurant and out its side door.  The shooter went back to his SUV and took off.  Watts did not get a clear look at the shooter's face and could not identify him.  Watts helped the victim.

Emergency medical technician Chris Walsh was also in Safeway.  Upon hearing seven shots, he went to treat the victim who was outside the restaurant.  The young man suffered a gunshot wound to his eye; the bullet "went in and out" above the victim's eye.  Walsh described the shooter as a Black male, wearing a white T-shirt and black jeans, carrying a black handgun.  He was of average build, wearing dreadlocks.  Walsh could not identify the shooter because of the distance, and he did not get a good look at his face.

Patricia Galgano was driving on Waterman Boulevard near the scene.  She heard five or six gunshots and saw flashes when the gun went off.  Galgano saw a dark-complected male with a gun, average height, wearing a white T-shirt and jeans or dark pants.  He had long, curly unkempt hair.

## 2. *Physical Evidence Recovered from Scene*

From the scene police officers located nine shell casings ejected from a semiautomatic weapon.  A white Nike shoe was also retrieved and submitted to the DNA section of the Department of Justice (DOJ) Crime Lab, for DNA testing.  DNA was extracted from the interior heel of the shoe and compared to [Rodriguez's] DNA buccal swab obtained from the Fairfield Police Department.  Senior criminalist Stephanie Carter from the DOJ lab testified that the genetic profile from the shoe revealed one major and at least two minor contributors, which was not uncommon for shoes.  Carter summarized her report: "The DNA typing results provide strong evidence that Jessi Rodriquez [*sic*] is the major male contributor to the male DNA detected on the sample."  The term "strong evidence" denotes a threshold of statistical calculation such that the probability that someone else was a major contributor was approximately one in 1.1 quadrillion African-Americans, one in 65 trillion Caucasians and one in 83 trillion Hispanics.  The shoe size was 7Y, an unusual man's shoe size.

## 3. *Victim Andrews's Testimony at First Trial*

Damond Andrews was unavailable for the second trial.  His testimony from the first trial was read to the jury.  The parties stipulated that Andrews identified [Rodriguez] in court.

On October 16, 2008, Damond Andrews, age 17 at the time, was at the home of [Rodriguez's] girlfriend.  Eight people were there, including [Rodriguez], whom he knew as "Grimy" but had never seen before; Sabrina Sablan and her brother; someone named "Q"; and Shig.  They were helping Sabrina's father, Paul Sablan (Sablan), move.

[Rodrigez] was upset because a necklace was missing. [Rodriguez's] girlfriend came out and asked to search everyone's pockets. Andrews would not let her search him but turned his pockets inside out.

Sabrina drove off in the Mustang with "Q" and Shig. Andrews, Sabrina's brother and Sablan drove off in another car. As they were getting ready to "hop on the freeway," another car came alongside and tried to cut them off. Sabrina pulled over as did Sabrina's brother. [Rodriguez] got in the back seat of the Mustang. Andrews and Sablan got out of the other car and went over to the Mustang. Andrews's friend told [Rodriguez] to get out of the car; as [Rodriguez] exited, he fell to the ground. As [Rodriguez] got up, Andrews saw "something shiny" in the waistband of [Rodriguez's] pants. People yelled that [Rodriguez] had a gun. Andrews tried to grab the back of the Mustang to get in, but Sabrina drove off. [Rodriguez] pointed at the car and starting shooting, about three times. Andrews and Sablan ran. Looking back, Andrews saw the gun pointed in his direction. At some point something hit Andrews's head and he felt his head ringing, but kept running. He felt pain over his eye and realized he was bleeding when Sablan said his head was bleeding. Andrews ran to a restaurant. He was taken by helicopter to John Muir Hospital, where he gave a statement to the police. Several days later he identified [Rodriguez] from a photographic lineup.

Andrews described [Rodriguez] as mixed race, about 19 years old. His hair was long and pulled back in a ponytail. Andrews thought [Rodriguez] might want to hurt him because "[h]e thought we had his chain."

Andrews said that most of the time he did not look at or open the subpoenas he received. He was not scared to testify, but he preferred to not be in court.

### 3. *Testimony of Sablan and Detective DeTomasi*

At the time of trial, Sablan was serving a sentence in Alameda County for felony assault with force likely to cause great bodily injury. Back in October 2008 he was moving from Fairfield to Alameda. He remembered a shooting and giving a statement to the police, but did not remember all the details; he might have been on drugs. He did not identify the shooter in the courtroom; the shooter was "probably . . . three times uglier" than [Rodriguez].

Thereafter Sablan reviewed the videotape of his interview with Detective DeTomasi. Apparently Sablan told DeTomasi he was living in a house in Fairfield that a "Jenny" and her father owned, and "Grimy" was also living there. Even after viewing the videotape, his answers were very equivocal. However, Sablan did admit to picking out a photo from a lineup.

The court indicated its opinion that Sablan's claimed lack of memory was not an honest lack of memory, and therefore the prosecution could impeach him with his statement to Detective DeTomasi. Detective DeTomasi testified that Sablan did not appear to be under the influence of alcoholic beverages or drugs when interviewed, seemed able to comprehend questions and spoke clearly. DeTomasi related that Sablan told him Jenny came outside and accused those present of stealing Grimy's necklace. Sablan related that Grimy was following the two cars, and he was scared for his daughter. Andrews got out of the car and was later shot. When Grimy jumped out of the car, he fell

down, and also removed a nine-millimeter silver semiautomatic handgun with a clip. Grimy first pointed the gun at Sablan and fired one round; Sablan dodged the bullet and told Sabrina to leave.  Next, the shooter turned toward Andrews and unloaded the clip.

DeTomasi showed Sablan a photographic lineup with approximately 20 photos. He identified [Rodriguez] very quickly from the lineup.

### B. *Defense Case*

[Rodriguez] testified that he went to Mexico in October 2008 because he was on bail on another case.  His public defender told him he would have to take a deal for two years in prison; he was scared and decided to leave the country.  He found a studio apartment in Tijuana from Craigslist.  He signed a lease on October 9, 2008, on the left side of each page.  The lease was written in Spanish.  Appellant paid $400 to Gustavo, the landlord.  He lived there "eight or nine months," hanging out, riding dirt bikes and playing a video game.

[Rodriguez] decided to return to the United States because he had a daughter, and his mother was ailing.  He told the border agents that he "had a warrant for evading."  He was arrested for attempted murder.  [Rodriguez] stated he did not shoot Damond Andrews and did not live at a residence with his girlfriend and Sablan; in fact he did not have a girlfriend.  He lived with his mother in Richmond.  He did not have an SUV vehicle or ever lose a white shoe.

### C. *Rebuttal*

Ibrahim Mohammad testified that he worked at Major Market in Fairfield.  In October 2008, a police officer showed him a picture of [Rodriguez] and his car, indicating the police were looking for him as the suspect in a shooting near Safeway. Mohammad began keeping notes, recording that [Rodriguez] came into the store on October 14, arriving in the Mercedes with a girl.  The store was equipped with a camera system; Mohammad was sure [Rodriguez] was in the store "because his picture is in my record."  [Rodriguez] last patronized the store on October 26, 2008.

*People v. Rodriguez*, No. A131096, 2012 WL 1881036, at *1-3 (Cal. Ct. App. May 23, 2012)

(footnote omitted).

Upon the conclusion of a second trial after the first ended in a hung jury, a jury convicted

Rodriguez of one count of attempted murder and two counts of assault with an automatic

firearm, and found true enhancements that, during the commission of the crimes, Rodriguez

personally used a firearm and, as to one of the assault charges, that he personally inflicted great

bodily injury.  *Id*. at *1.  The court sentenced Rodriguez to an aggregate determinate sentence of twelve years and four months, plus an indeterminate term of twenty-five years to life.  *Id*.

Rodriguez appealed, arguing through counsel that: 1) the admission of Andrews' prior testimony violated his Sixth Amendment right to confront witnesses against him; 2) he was denied his Sixth Amendment right to present a defense and right to a fair trial when the trial court refused to admit into evidence the lease for the apartment he rented in Mexico; and 3) the trial court erred in denying his *Marsden* motion[2] without a hearing.  On May 23, 2012, the Court of Appeal affirmed his judgment of conviction in a reasoned opinion.  *Id*. at *7.

Rodriguez then filed a counseled petition for review, in which he raised the same claims he unsuccessfully raised before the Court of Appeal.  The Supreme Court summarily denied review on August 22, 2012.  Rodriguez did not file any petitions for writ of habeas corpus with the state courts.  He filed the instant Petition with this Court on November 18, 2013.  Respondent concedes that Rodriguez exhausted his claims in state court and does not contest the timeliness of the Petition.

## II. GROUNDS RAISED

In his Petition before this Court, Rodriguez raises the same claims he unsuccessfully raised on direct appeal.  First, Rodriguez argues that the admission of Andrews' prior testimony violated his Sixth Amendment right to confront the witnesses against him.  Second, he argues that he was denied his Sixth Amendment right to present a defense and right to a fair trial when the trial court refused to admit into evidence the lease for the apartment he allegedly rented in

---

[2]     *See People v. Marsden*, 465 P.2d 44 (Cal. 1970) (holding it was error for the trial court to deny a defendant's motion to relieve his court-appointed attorney without holding a hearing to allow the defendant to explain its grounds).

Mexico.  Third, and finally, Rodriguez claims that the trial court erred in denying his *Marsden*

motion without a hearing.

III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is "contrary" to federal law "if the state court applies a rule

that contradicts the governing law set forth" in controlling Supreme Court authority or "if the

state court confronts a set of facts that are materially indistinguishable from a decision" of the

Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362,

406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)

"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

-6-

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

Confrontation Clause

Rodriguez first argues that the trial court violated his right to confront the witnesses against him by admitting Andrews' preliminary hearing testimony at trial because the prosecution did not exercise due diligence in attempting to procure his presence at the second trial. The Court of Appeal denied Rodriguez relief on this claim on direct appeal:

> 1. *Legal Background*
>
> The confrontation clause renders testimonial statements offered against a criminal defendant inadmissible, unless the witness is unavailable at trial and the defendant has had a prior opportunity to cross-examine. (*Crawford v. Washington* (2004) 541 U.S. 36, 59.) A witness is unavailable, when, among other situations, the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) Reasonable diligence "'connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.' [Citations.]" (*People v. Cromer* (2001) 24 Cal. 4th 889, 904.) Relevant factors include the timeliness of commencing the search, the importance of the witness's testimony, and whether leads were completely explored. (*Ibid*.) Other factors are whether the prosecution reasonably believed the witness would appear willingly at trial and therefore did not subpoena the witness when he or she was available; and whether the witness would have been produced with the exercise of reasonable diligence. (*People v. Sanders* (1995) 11 Cal. 4th 475, 523.)
>
> In the last analysis, "''[t]he lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness.['] [Citation.] The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness.' [Citations.]" (*People v. Herrera* (2010) 49 Cal. 4th 613, 622.) We review the trial court's resolution of disputed factual matters under the

substantial evidence standard, but independently review whether the facts amount to good faith and due diligence on the part of the prosecutor.  (*Ibid*.)

2. *Factual Background*

The trial court conducted an evidentiary hearing on the matter of due diligence. Aaron Dillon, a criminal investigator for the Solano County District Attorney's Office, testified that subpoenas are usually served by process servers, but when a witness is difficult to locate, the district attorney will assign an investigator to locate and serve that person, which is what occurred in the case of Damond Andrews.

Dillon had been assigned to escort Andrews back and forth from court during the first trial, and spoke with him in September 2009.  Thereafter he was asked in early November 2010 to locate Andrews for the December 6, 2010 retrial.

Dillon did not have a current telephone number for Andrews, but knew he lived with his mother in Vallejo.  Therefore, he first contacted Andrews's mother on November 4, 2010, by phone and asked that she have Andrews call him.  Next, he called her at work on November 10, again requesting that she have Andrews call him.  The mother indicated she had told Andrews to call Dillon, and would relay the request again.  The mother seemed cooperative on the phone, and had been cooperative in the past.  However, she did not volunteer whether Andrews was still living with her.

On November 22, 2010, Dillon went to the mother's residence and waited for 15 or 20 minutes.  There were no lights on in the house and no activity.  On December 3, he went back at 7:15 a.m. and waited for an hour and a half; again, no activity.  Dillon knocked on three doors in the court to no avail, but on the fourth door a resident did answer.  Dillon inquired if Andrews or his mother still lived at the address in question. The resident thought someone had moved in within the last two or three weeks.  The neighbor was not familiar with Andrews.  Dillon also left a business card at Andrews's prior address, asking that the residents give him a call.  A lady responded and said she had moved in three weeks earlier.

Dillon also used several databases in his efforts to find Andrews.  He checked the local system to ascertain if Andrews were on probation or had been arrested, and ran a Department of Motor Vehicles check to see if there were any updated addresses.  As well, Dillon processed Andrews's personal information through the "Accurint" database. Further, he checked the "ARIES" database for arrest records or criminal justice contact information for Solano, Alameda and Contra Costa Counties.  He searched the mother through Department of Motor Vehicles records.  None of these searches were fruitful in terms of locating a current address for Andrews.

Dillon did not search Andrews's John Muir Hospital medical records; check for change of address with the post office or voter registration files; or check for claims of restitution.  Dillon did not contact the mother at the work place again because he did not want to upset her; she was not pleased when he called her there before.  Dillon figured she would be more cooperative and have Andrews contact him if he stayed away from her work place.

Dillon testified that a month after the first trial, Andrews told him he "did his homework" and realized who [Rodriguez] and his friends were.  Andrews was from

-8-

Vallejo, not Fairfield.  After finding out about [Rodriguez] from "the street," he did not want to testify, dropped out of high school because he was scared, and was afraid to leave his house.  Andrews's mother confirmed this state of affairs.

The trial court found due diligence and allowed Andrews's testimony from the first trial.

3. *Analysis*

[Rodriguez] asserts that the prosecution failed to exercise reasonable diligence in securing Andrews's presence at the second trial.  He faults the investigator for not attempting to contact Andrews's mother at her place of employment, not using a reverse directory to obtain an address, not asking her if Andrews still lived with her, and not checking with the post office for a change of address or with voter registration records.

That additional efforts might have been undertaken or other lines of inquiry pursued does not mean that the prosecution failed to exercise due diligence.  (*People v. Wilson* (2005) 36 Cal. 4th 309, 342.)  Under all the circumstances, we conclude that the above facts amounted to due diligence as a matter of law.

To begin with, the search was timely begun and entailed a range of efforts to explore leads.  Dillon reasonably believed Andrews was still living with his mother in Vallejo.  Mother and son had a good relationship, and Dillon had contacted Andrews there in the past.  Dillon made two phone calls to his mother urging her to have Andrews contact him, went to the home on two occasions, and canvassed the neighborhood for information about their whereabouts. Dillon also effected numerous database searches for updated information.  On December 3, 2010, three days before the second trial, Dillon learned that Andrews's mother had moved.

It is also undisputed that Andrews's testimony was important.  Further, there was no evidence that he could have been located or would have appeared if further efforts had been made.

[Rodriguez] relies on *People v. Cromer, supra,* 24 Cal. 4th 889, arguing that as in that case, the facts do not demonstrate that the prosecution exercised reasonable diligence.  In *Cromer,* the prosecution had lost contact with the witness after the preliminary hearing and thereafter learned of her disappearance, but made no serious effort to locate her for several months.  When the prosecution obtained promising information that the witness was living with her mother in another location, investigators waited two days to check out the information and, learning the mother would return the next day, never bothered to return to speak to her.  (*Id*. at p. 904.)  Here, Dillon reasonably believed Andrews was still living with his mother, made contact with her, and did not learn that the family had moved until three days before trial.  Databases were searched and the neighborhood was canvassed.  *Cromer* does not render the prosecution's efforts wanting in this case.

*Rodriguez*, 2012 WL 1881036, at *3-5.

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, *Pointer v. Texas*, 380 U.S. 400, 403 (1965), provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him," U.S. CONST. amend. VI.  In *Crawford v. Washington*, 541 U.S. 36, 51 (2004), the Supreme Court clarified Sixth Amendment jurisprudence and held that the Confrontation Clause guarantees a defendant's right to confront all witnesses who "bear testimony" against him.  Thus, the Supreme Court explained that the Sixth Amendment prohibits the admission of "testimonial" hearsay unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.  *Id*. at 68.  The prosecution has a duty to make a good faith effort to locate a witness, and the lengths to which the prosecution must go to produce a witness is a question of reasonableness.  *Hardy v. Cross*, 132 S. Ct. 490, 494 (2011) (per curiam).

Rodriguez does not contest that he had a prior opportunity to cross-examine Andrews; rather, his complaint is that the court erroneously deemed Andrews unavailable because the prosecution did not exercise due diligence in attempting to locate him.  However, *Cross* is established federal law which controls Rodriguez's claim, and the state court's determination that the prosecutor exercised due diligence in attempting to find Andrews was not unreasonable under the circumstances, in spite of Rodriguez's protestations that the investigator should have used other, additional methods to locate him.  *See id*. at 495 (reversing the Seventh Circuit's conclusion that the prosecutor's efforts to locate a witness were not reasonable, even though there were additional avenues that the prosecution could have pursued in locating that witness).  "[W]hen a witness disappears before trial, it is always possible to think of additional steps that

the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Id.* (internal citation omitted).  In addition, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken.  Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed." *Id.* Accordingly, Andrews was appropriately deemed to be "unavailable" for purposes of introducing his preliminary hearing testimony at trial.

Admission of the lease

Rodriguez next contends that he was denied the constitutional right to a fair trial and to present a defense because the trial court denied his request to admit evidence of a lease that he purportedly entered into in Mexico, which he claims would show that he could not have been the shooter because he was not in the United States at the time of the incident.  Rodriguez maintains that the trial court should have had the lease, which was written in Spanish, translated and admitted at trial.  Alternatively, he asserts that if the issue is deemed waived due to trial counsel's failure to request that the lease be admitted, then he was denied the effective assistance of counsel.  The Court of Appeal denied him relief on this claim on direct appeal:

> At the commencement of trial, the prosecutor stated he would object to entering the lease into evidence, arguing that the lease was in Spanish and [Rodriguez] could not establish a foundation "as to what [this] is" "because I don't think he reads Spanish," and he did not generate the document.  Further the prosecutor argued the lease was hearsay that did not appear to come within a business records exception.  Defense counsel stated at that time that she was not seeking to admit the lease unless she could establish a basis for it.  At that point the court noted that there was no issue with the lease.  At the close of trial, the court indicated its understanding that the defense was not seeking admission of the lease.  However, counsel asked for its admission.  The court refused, stating: "There's no transcription.  It's in a foreign language, so it won't be admitted."

[Rodriguez] urges that the trial court had a duty to call an interpreter to translate the lease and admit it into evidence. Evidence Code section 753, subdivision (a) (section 753)[FN3] provides: "When the written characters in a writing offered in evidence are incapable of being deciphered or understood directly, a translator who can decipher the characters or understand the language shall be sworn to decipher or translate the writing." Although the trial court did not follow the dictates of section 753, it was lulled into thinking there was no issue with the lease. [Rodriguez's] counsel waited until the last minute to ask for admission and had not put anything in motion to translate a document which was offered in support of her client's alibi defense.

> FN3. The deputy attorney general does not refer to or discuss section 753 at all, instead hanging her argument that [Rodriguez] forfeited the issue on "California Rules of Court, rule 311(e) [which] provides, in relevant part: 'Exhibits written in a foreign language shall be accompanied by an English translation, certified under oath by a qualified interpreter.'" Of course there is no current version of rule 311(e), a Rule of Court that has not existed for years. The proper number is rule 3.1110(g), which is part of division 11 of the civil rules pertaining to civil law and motion.

To prevail on a claim of ineffective assistance of counsel, the defendant must demonstrate both that (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defendant, the prejudice inquiry asking whether there was a reasonable probability that counsel's conduct had an adverse effect on the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Huggins* (2006) 38 Cal. 4th 175, 248.) Where it is apparent that the prejudice prong cannot be satisfied, we need not consider whether trial counsel's performance was deficient. (*People v. Price* (1991) 1 Cal. 4th 324, 440.)

The evidence against [Rodriguez] was overwhelming. Andrews testified that [Rodriguez] shot him. Sablan identified [Rodriguez] as the shooter and told Detective DeTomasi that [Rodriguez] fired a shot at him. The shooter lost a shoe at the scene. DNA evidence confirmed it was [Rodriguez's] shoe. Other witnesses testified consistently to the shootout. Mohammad testified that [Rodriguez] was a customer in his store on October 14 and 26, 2008—during the time [Rodriguez] claimed to be in Mexico—and had a video camera system to support his records. Moreover, from a procedural point of view, had the trial court entertained the possibility of admitting the lease at the last minute, the prosecutor's foundational objections remained an obstacle. In any event, it is not reasonably probable that [Rodriguez] would have been acquitted had the lease been translated into English and admitted into evidence. Nor can [Rodriguez] establish prejudice under the constitutional standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.

*Rodriguez*, 2012 WL 1881036, at *6.

The Supreme Court has acknowledged its "traditional reluctance to impose constitutional restraints on ordinary evidentiary rulings by state trial courts." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986). The Supreme Court has further made clear that federal habeas power does not allow granting relief on the basis of a belief that the state trial court incorrectly interpreted the state evidence code in ruling on the admissibility of evidence. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A petitioner seeking habeas relief from an allegedly erroneous evidentiary ruling bears the burden of establishing that the evidentiary error deprived the petitioner of due process because it was so pervasive that it denied the petitioner a fundamentally fair trial. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). And, as the Court of Appeal noted, in order to demonstrate that he was denied the effective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense. 466 U.S. at 687.

Rodriguez cannot establish that trial counsel's failure to timely request that the court translate the lease prejudiced his defense, or that the trial court's failure to comply with the California Evidence Code and have the lease translated denied him a fair trial, because, as the Court of Appeal noted, the evidence against Rodriguez was simply overwhelming. Two people, including the victim, identified Rodriguez as the shooter, and the odd-sized shoe Rodriguez left at the scene contained his DNA. According to Mohammad's records, which he testified were supported by security video footage, Rodriguez came into his store twice during the time that he was allegedly renting an apartment in Mexico. Thus, it is highly unlikely that, even if the lease

-13-

had been admitted as evidence of his alibi, he would have been acquitted.  Rodriguez

accordingly cannot prevail on this claim.

Denial of *Marsden* motion without a hearing

In the middle of sentencing, Rodriguez's trial counsel informed the court that Rodriguez

"would like private counsel appointed today for the purpose of exploring a new trial motion.  He

doesn't want to proceed today."  The trial court denied the request as untimely.  Rodriguez was

shortly thereafter removed from the courtroom for spitting, wherein some spit seems to have hit

his counsel, and was placed in a holding cell from which he could see and hear the remainder of

the sentencing hearing.  The Court of Appeal denied Rodriguez relief on this claim on direct

appeal:

> In the present case, [Rodriguez] did not make a *Marsden* motion.  And, as the
> People point out, he was aware of what such a motion entails because he unsuccessfully
> pursued a *Marsden* motion earlier in the proceedings.  [Rodriguez] did not express
> dissatisfaction with counsel, having neither related, nor offered to relate, any instances of
> misconduct.  Nor did he suggest a fundamental breakdown had occurred in the attorney-
> client relationship.  (*See People v. Padilla* (1995) 11 Cal. 4th 891, 926-927, overruled on
> another point in *People v. Hill* (1998) 17 Cal. 4th 800, 823, fn. 1.)  [Rodriguez] merely
> asked for appointment of private counsel to explore a motion for new trial.  In these
> circumstances, the trial court did not abuse its discretion in denying [Rodriguez's]
> request.

*Rodriguez*, 2012 WL 1881036, at *7.

The Sixth Amendment right to counsel guarantees to an accused the concomitant rights to

conflict-free representation and the effective assistance of counsel.  *See Wheat v. United States*,

486 U.S. 153, 156 (1988); *Strickland*, 466 U.S. at 686.  These rights may be infringed if an

accused and his counsel become embroiled in an "irreconcilable conflict."  *See Stenson v.*

*Lambert*, 504 F.3d 873, 886 (9th Cir. 2007) ("[F]orcing a defendant to go to trial with an

attorney with whom he has an irreconcilable conflict amounts to constructive denial of the Sixth

Amendment right to counsel." (citing *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) ("[T]o compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.")); *see also Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005).

However, "not every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc) (citing *Morris v. Slappy*, 461 U.S. 1, 13-14 (1983)). The Sixth Amendment does not require or guarantee, implicitly or otherwise, that an attorney-client relationship be "meaningful" or free of discord. *Morris*, 461 U.S. at 13-14; *see Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008) (en banc) ("[Petitioner] has cited no Supreme Court case—and we are not aware of any—that stands for the proposition that the Sixth Amendment is violated when a defendant is represented by a lawyer free of actual conflicts, but with whom the defendant refuses to cooperate because of dislike or distrust."). Rather, an asserted conflict crosses the constitutional threshold "only where there is a complete breakdown in communication between the attorney and client, and the breakdown prevents effective assistance of counsel." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also Daniels*, 428 F.3d at 1197 (the nature and extent of the conflict must be such as to "deprive[] the defendant of representation guaranteed by the Sixth Amendment." (citing *Schell*, 218 F.3d at 1027)). Denial of a *Marsden* motion to relieve and/or substitute appointed counsel may implicate these Sixth Amendment concerns. *Schell*, 218 F.3d at 1021 ("Normally, the essence of such a motion is that appointed counsel's representation has in some significant way fallen below the level required by the Sixth Amendment.").

On habeas review, the ultimate constitutional question is whether the state court's disposition of a *Marsden* motion violated the petitioner's right to counsel because the asserted conflict between the petitioner and appointed counsel "had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Id*. at 1026.  If the Court determines the existence of a conflict so serious that it "resulted in the constructive denial of assistance of counsel, no further showing of prejudice is required," and the "trial shall be presumed to have been unfair." *Id.* at 1027-28 (citing *Strickland*, 466 U.S. at 692).  "If the serious conflict did not rise to the level of a constructive denial of counsel, [the petitioner] would have to prove he was prejudiced by the conflict." *Id*. at 1028.

The Ninth Circuit has identified three factors guiding the reviewing court's determination of whether a conflict with counsel was "irreconcilable" such that the substitution of counsel was constitutionally required.  Foremost, the court should consider the nature and extent of the conflict; namely, the cause of the conflict and the circumstances in which it developed, and whether the defendant had legitimate reasons for the loss of confidence in his counsel.  *See id.* at 1026-27 (the reviewing court should determine how far the attorney-client relationship had deteriorated and whether any conflict was of the defendant's "own making" or arose from decisions properly left to counsel).  In this regard, "[d]isagreements over strategical or tactical decisions do not rise to [the] level of a complete breakdown in communication." *Stenson*, 504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026); *see also United States v. McKenna*, 327 F.3d 830, 844 (9th Cir. 2003) (holding that a dispute with respect to trial tactics "is not a sufficient conflict to warrant substitution of counsel"); *United States v. Wadsworth*, 830 F.2d 1500, 1509 (9th Cir.

-16-

1987) ("[A]ppointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense.").  The court should also consider the adequacy of the inquiry and the timeliness of the motion to substitute counsel.  *Stenson*, 504 F.3d at 886; *Schell*, 218 F.3d at 1024-25.  Particularly, the court should examine whether the inquiry undertaken by the trial court was "such [as] necessary . . . [to] ease the defendant's dissatisfaction, distrust and concern" and whether the inquiry conducted "provide[d] a sufficient basis for reaching an informed decision . . . regarding whether to appoint new counsel."  *Stenson*, 504 F.3d at 886 (citations, internal brackets, and quotation marks omitted); *see also Schell*, 218 F.3d at 1025.

The Court of Appeal's conclusion that Rodriguez did not actually make a motion for the substitution of counsel is not unreasonable, given that Rodriguez was experienced with the requirements of a *Marsden* motion and did not otherwise indicate dissatisfaction with his trial counsel.  And even if this Court were to construe Rodriguez's request as a motion for substitute counsel, he would not be entitled to habeas relief on this claim.  There is no evidence that Rodriguez and trial counsel had a complete breakdown in communication amounting to the ineffective assistance of counsel.  Rodriguez is therefore not entitled to relief on this claim either.

## V. CONCLUSION AND ORDER

Rodriguez is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain

a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 15, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge